R.E. SCOTT
R.E. SCOTT & ASSOCIATES
CBN 67465/DCBN 425778
  WSBN 24709
Maple Business Park
125 Business Center Dr. Ste. C
Corona, California 92880-6921
Telephone 951/273-9730
Telecopier 951/273-9734

Attorneys for Defendant CHRISTOPHER WELDON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO.: ED CR 12-00057 VAP (4) |
| Plaintiffs, | ) DEFENDANT'S SENTENCING MEMORANDUM |
| vs. | ) |
| CHRISTOPHER WELDON, | ) |
| Defendant. | ) |

## I

## THE OFFENSE

### A) THE CHARGE AND PLEA

Defendant has pleaded guilty to Count 1 [**18 U.S.C. §1594**] [Conspiracy to Engage in Sex Trafficking] of an 18 count Indictment [Plea Agree., ¶2][1] for his participation in a scheme to engage females in prostitution. Pursuant to a Plea Agreement the parties have stipulated to recommend an offense level of 30 minus a 3 level decease for early acceptance for a total offense level of 27 [PSR ¶3]. The parties also reserved the right to argue for additional offense characteristics, adjustments and departures as well as a sentence outside the advisory Guideline

---

[1]    Of the eighteen counts defendant was only charged in Count 1, the Conspiracy charge, and Count 14, violation of **18 U.S.C. §1591(a)(1)** [Sex Trafficking].

range [PSR ¶¶4-5].

Probation also sets the level at 27. It has determined that defendant's criminal history category is I in the absence of any calculable criminal record [PSR, ¶¶64-71]. Based on the above, Probation determined the range to be 70-87 months [PSR, p. 3] and recommended a variance from the Guidelines for a sentence of 48 months [Prob.Recom.Ltr., p. 1].

**B) THE FACTS**

Sometime before March, 2011, defendant's co-defendants became involved in a conspiracy to recruit and run prostitutes. Many of the victims were recruited by certain co-defendants from schools. Defendant was not involved in the scheme until Paul Bell, his step-brother who was involved, was arrested and Victim 3 showed up at defendant's residence and asked him to drive her to Long Beach so she could conduct business for Bell. He also accepted some money from Victim 3, a minor, and another co-defendant which he held for Bell and gave him when he was released. At some point he also put a firearm in his grandmother's garage for Bell, The gun was dropped off by another of the co-defendants. All in all, defendant's assistance ran for about a total two week period in March, 2011 and in August or September, 2011. When Bell was released the final time defendant went back to his own life and was not involved again. He was paid nothing for his efforts and never acted as a "pimp" himself [Plea Agree., ¶¶10, 34(g); Prob.Recom.Ltr., pp. 2-4]. [2]

## II

## CRIMINAL HISTORY

Probation has placed defendant in Criminal History Category I based on no qualifying criminal convictions.

## III

## CO-DEFENDANTS AND PROPORTIONALITY

Only one of defendant's co-defendants has been sentenced. Kimberly Alberti was charged with being a part of the conspiracy for an extended period, recruiting girls to act as prostitutes in high schools (she was 17 years at the time), over the telephone and on the Internet. She was also active recruiting from an alternative high school for pregnant teens and teen mothers. She was

---

[2] During an interview with agents, Victim 8 identified a picture of defendant and said he was Bell's brother "Chris" who had nothing to do with it and was a "good kid" [PSR, ¶38].

1  successful in recruiting Victim 3 and schooled her in the "tricks" of the trade - - how to prostitute,
2  how to charge, how to avoid the law, and the rules to follow. In sum, Alberti was heavily involved
3  in the scheme [Govt.Sent.Memo/Alberti, pp. 5-7].

4         Probation computed her offense level at 37 with a range of 210 - 262 months but
5  recommended a sentence of 24 months. The Government asked for 42 months. She received the 24
6  month sentence.

### III

### DEFENDANT'S BACKGROUND[3]

9         Defendant's background is very enlightening. Defendant is currently 24 years old and was
10 22 when he became involved in this case. In 1997 his father died of cancer and he was raised by
11 his mother with his step-brother, Paul Bell, a co-defendant in this case. Defendant's childhood
12 was, to put it mildly, problematic. His mother was involved in chronic and excessive cocaine and
13 alcohol abuse, frequently having parties where strangers would come in and out of the house. They
14 lived in a tough neighborhood in Compton and his mother did not have stable employment because
15 of her addictions. In his early years, he only attended school sporadically.

18        Bell, five years older than defendant,  took the role of a big brother. Predictably, he also
19 became involved with drugs and gangs early on. While Bell followed his criminal endeavors, and
20 despite the fact that defendant described their relationship as "close", defendant took a different
21 road. He was an introvert and more responsible so he stayed at home, cared for his mother and
22 grandmother and attended school. He stayed away from gangs and has never used drugs. They had
23 different friends and totally different lifestyles.

25        From the age of 8 - 11 defendant was removed from his mother's home and placed with his
26 grandmother and aunt who provided a more stable environment. He attended school regularly and
27 considered his grandmother his "mother figure". While his mother "got straight" in 2000 her

---

[3] Defendant attaches hereto Exhibit "A" which includes letters from defendant to the Court
as well as letters from his mother, friends and co-workers.

periods of sobriety have been fleeting.

Since 2008, defendant had been caring for his aged grandmother who suffers from Alzheimer's and Dementia. When his aunt passed away in 2009 he became her sole support while also caring for his mother.

In 2010 he met Alexis Frank and they now have a 17 month old son who has asthma. Before his arrest defendant and Frank were living together and he would commute between Colton, where they lived and Los Angeles where he cared for his mother and grandmother and also had a job. He was working two additional jobs, one as a security guard at a shopping mall in Chino Hills and one as a supervision aide  at an elementary school in Los Angeles for the LAUSD. Defendant and Frank plan to marry.

Defendant received his GED in 2011. He also attended Child Development classes at the Southwest Community College in Los Angeles. He was enrolled at Valley College for an electrical engineering major when arrested [PSR ¶¶77-109; also see Mother's letter, Exh. "A", p. 2].

IV

RECOMMENDATIONS

**A) PLEA AGREEMENT**

Defendant and the Government have entered into a Plea Agreement which provides as  follows:

| | |
|---|---|
| Base Offense Level [USSG §2G1.3(a)(2)] | 30 |
| Adjustment for Acceptance of Responsibility [3E1.1] | <u>-3 </u> |
| Total Offense Level | 27 |

The above recommendation results in a Guideline sentence of 70-87 months [Plea Agree., ¶12]. Both sides also reserved the right to argue adjustments, offense characteristics and departures and the Government specifically reserved the right to argue USSG §2G1.3 and §3A1.1(b)(1) enhancements [Plea Agree., ¶12].

-4-

**B) PROBATION RECOMMENDATION**

Probation recommends the following:

| | |
|---|---|
| Base Offense Level [USSG ¶2G1.3(a) | 30 |
| Adjustment for Minor under Control of defendant [USSG §2G1.3(b) | |
| (1)(B) | +2 |
| Adjustment for Minor Role [USSG §3b1.2] | -2 |
| Adjustment for Acceptance of Responsibility [3E1.1] | <u>-3</u> |
| Total Offense Level | 27 |

Again, the recommendation provides for range of 70-87 months [PSR ¶¶45-50]. Nevertheless, Probation also recommends a variance and a sentence of 48 months [P:rob.Recom.Ltr., p. 1].

V

**DEFENDANT'S SENTENCING POSITION**

**A) MITIGATING FACTORS**

Without denigrating the seriousness of the offenses to which he has pled guilty, defendant urges the Court to take a special look at his background and the circumstances which led to his involvement in the offense as well as the extent and duration of his involvement.

First and foremost, defendant's involvement amounts to the following:

- In August, 2011[4], long after the conspiracy began, Bell was arrested and defendant, who had three jobs at the time, was approached at home by Victim 3 who asked him to drive here to Long Beach to make some money for Bell, which defendant did three times; after dropping her off he did not wait but returned home, picking her up when she needed it.

- Victim 3 gave him the money she made and he held it for Bell, taking none for himself.

---

[4]   The Probation report reports March, 2011, but according to defendant's recollection it was August, 2011.

1          - Victim 3 would use her phone to make dates and once made she would go out

2   on the date and give the money to defendant which he would again hold for Bell.

3          - When Bell got out of jail defendant gave him in excess of $1000.00 which had

4   been given to him by Victim 3 and that ended his involvement in the scheme and defendant

5   returned to his own life.

6

7          - the extent of his involvement in August, 2011, consisted of about 1 week.

8          - after Bell was released from jail "Yan", a friend of Bell who was not a

9   prostitute, gave defendant some money for Bell and at one point gave defendant money for Bell's

10  attorney.

11

12         - at one point defendant went to Adelanto with "Yan" to retrieve Bell's car

13  which had been impounded but they were unsuccessful.

14         - in August, 2011 Bell returned to jail and asked defendant to go to Bell's

15  apartment in Lynwood every day to collect money from co-defendant Brooks, which he did.

16         - he used the money to pay Bell's rent and received none for himself.

17

18         - defendant would talk to Bell weekly on the phone and report how much

19  money Brooks had given him.

20         - during a phone call from jail Bell told defendant to put a gun in his

21  grandmother's garage and afterwards "Yan" brought a gun which he put in the garage.

22

23         - when Bell was released from jail defendant gave him the money and again

24  went back to his own life.

25         - Bell was released sometime in December, 2011 and after that defendant did

26  nothing for Bell [PSR ¶41].

27         The bottom line is that defendant, who had otherwise lived a lawful and

28  productive life, did not profit from his activities on behalf of Bell and when the first opportunity

    presented itself he withdrew and left Bell to his own devices.

1        Juxtaposed against the foregoing is the somewhat incongruous lifestyle which

2   defendant had chosen to live despite his upbringing.

3        Defendant and Bell were raised together by their single parent mother who

4   suffered from a severe cocaine and alcohol addiction which caused her to be essentially

5   unemployable. As a result, there were raised in a poor and tough area of Compton. Bell was five

6   years older than defendant and as the older brother defendant admired and looked up to him.

7   Predictably, Bell at an early age became involved with drugs and gangs and began his downward

8   slide into a life of crime. In a somewhat counterintuitive move, defendant, on the other hand,

9   rejected not only his mother's but his brother's lifestyle and attended school, kept his nose clean

10  and led a lawful and productive life. At the time of the incident which brings him before the Court

11  he was holding down three jobs, a supervision aide at an elementary school in Los Angeles for the

12  LAUSD., a security guard in Chino Hills and as a caretaker for his invalid grandmother. The first

13  two being highly regulated jobs. He and his girlfriend had had a baby which he was preparing to

14  raise. Certainly not a predictable outcome for a man coming from the childhood defendant was

15  forced to endure.

16       Also notable is defendant's positive outlook on life, most emphasized by his co-

17  workers who describe him as friendly, positive and a bit of a joker [see Exh. "A", pp. 5,8,9]. Not

18  the expected attitude of one involved in the pimping trade.

19       Probation, in considering the various factors relevant to sentencing and justifying

20  their recommendation for the variance notes that defendant's involvement only occurred during

21  brief time periods and then only to assist his brother, that defendant did not engage in any of the

22  abusing nor controlling actions undertaken by his co-defendants and, of most importance, that

23  "there is no indication that . . . [defendant] . . . had the proclivity for, pursued or profited from a

24  criminal lifestyle." He just made a bad choice to help his brother [Prob. Recom.ltr., p. 3]:

25          "Up until the offense and law enforcement contact in 2011, Weldon,

a dependable son and grandson, defied odds and overcame significant

obstacles to become a productive member of society. Aside from a

contact with law enforcement in June 2011 . . . . Weldon appears to

have shown he can respect the law. As a juvenile, he had no law

enforcement contacts, and he has never served a custodial sentence"

[Prob.Recom.ltr., p. 3]

As a result of a single, misguided decision, defendant will no longer be allowed to

work in the security industry and will have to register as a sex offender, both serious consequences

for his behavior.

**B) ADJUSTMENTS**

Whether stated in terms of an adjustment, departure or a variance as

recommended by Probation, defendant requests the Court to depart from the Guideline range.

**1) ADJUSTMENT FOR ABERRANT CONDUCT**

Defendant requested Probation to consider recommending a departure for aberrant behavior

but Probation declined to do so because defendant did not commit a single criminal offense but

collected proceeds for Bell on several occasions. Also, Probation, in a statement which appears to

be a *non sequitur* following all of the observations about defendant's lifestyle before this offense,

states that " . . . it would be difficult to conclude that this defendant's involvement in this offense,

which occurred when Weldon was 21-years -old, was a `marked deviation from an otherwise law-

abiding life'" [Prob.Recom.Ltr., p. 4].

USSG §5K2.20 provides a departure for aberrant conduct may be given if

defendant was involved in a single criminal occurrence or a single criminal transaction and it was

committed 1) without significant planning, 2) was of a limited duration and 3) "represents a

marked deviation by the defendant from an otherwise law-abiding life" [USSG §5K2.20(b)].

First, while defendant was involved in a number of "occurrences" he urges the

1  Court that his conduct constituted a single criminal transaction, that of collecting money for his

2  brother, and therefore still qualifies under the mandating Guideline. Additionally, there is no

3  question his involvement was of limited duration and lastly the conduct was clearly aberrant *vis a*

4  *vis* his prior and then current lifestyle.  Probation acknowledges this when it states "there is no

5
6  indication that . . . [defendant] . . . had the proclivity for, pursued or profited from a criminal

7  lifestyle" [Prob. Recom.Ltr., p. 3].

8          The Guidelines advise the Court to consider defendant's mental and emotional

9  condition, his employment record, his record of prior good works, his motivation for committing

10  the offense and his efforts to mitigate the effects of the offense [USSG 2K5.20, Application Notes,

11
12  Note 3]. For all of the reasons discussed *supra,* defendant urges that he clearly qualifies for such a

13  departure. As none of the prohibitions to a departure for aberrant conduct apply to defendant

14  [USSG §5K2.20©] he requests the Court to seriously consider a departure on this ground as he

15  urges that, considering his background and lifestyle, he is tailor made for this departure.

16
17  **2) ADJUSTMENT FOR MINIMAL ROLE**

18          While Probation has determined that defendant qualifies for a 2 level downward

19  adjustment for minor role in the offense it has rejected a 4 level adjustment for minimal role,

20  reasoning that since Bell allowed defendant to house, transport and collect money from Victim 3

21  he was in a position of knowlege and held a trusted position in the conspiracy [PSR ¶¶49-53].

22          Defendant urges that his involvement was indeed minimal. He became involved

23  with Victim 3, and only Victim 3, at her insistence and not that of Bell. While he did collect

24  money to hold for Bell he did not profit from it. Indeed, he had no stake nor did he develop one in

25  the conspiracy. He merely thought he was helping his brother. He had no vesting in the criminal

26  lifestyle nor in the continuation of the conspiracy. In sum, he had no interest in either Victim 3 nor

27
28  in the conspiracy - - his only interest was in a mis-guided desire to help his brother. There is no

evidence he had any role in planning or implementation of any of the objectives of the conspiracy

nor was he involved with any aspect of the conspiracy other than Victim 3 and holding money for

Bell. As the Court is aware, this conspiracy involved a number of participants and a number of

prostitutes - - all involved in achieving the objectives of the conspiracy - - a much wider net than

that with which defendant was involved. With all due respect to Probation, he urges the Court that

he clearly qualifies for a 4 level downward departure for minimal role.

### C) SENTENCE ANALYSIS

The beginning of any analysis of the appropriate sentence is a consideration of the

factors enumerated in **18 U.S.C. §3553(a)**. While defendant does not in any way intend to diminish

the severity of the charges to which he has pled guilty, he does urge the Court that a reasonable

appreciation of the enumerated factors postulates the ultimate conclusion that while Probation's

ultimate recommendation is appropriate - - i.e., 48 months.

Whereas the "nature and circumstances of the offense" [**18 U.S.C. §3553(a)(1)**]

have been exhaustively discussed in Probation's Recommendation Letter and the PSR, the "need

for the sentence imposed" [**18 U.S.C, § 3553(a)(2)** is what defendant would ask the Court to focus

on. First, the recommended sentence will do nothing to diminish the need to reflect "the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense" [**18 U.S.C. §3553(a)(2)(A)**]. There is ample evidence before the Court of defendant's

sincere remorse for what he did [szee Exh. "A", p. 1], both by accepting responsibility for his acts

and because of the mitigating factors discussed above. Additionally, there is no reason to believe

that he will be a recidivist. He led a lawful life before and he can lead a lawful life from now on - -

albeit with the additional impediments which will be imposed by this conviction in the nature of

much more limited employment prospects and the lifetime detriment of the sex registration

requirement.

The same argument equally applies to an evaluation of the necessity of affording

an adequate deterrence to criminal conduct [**18 U.S.C. §3553(a)(2)(B)**] and protecting the public

1  from further crimes of the defendant [**18 U.S.C. §3553(a)(2)(C)**] - and, lastly, defendant's work

2  and educational history demonstrates that he has the tools to provide for his family in a lawful and

3  meaningful manner [**18 U.S.C. §3553(a)(2)(D)**].

4          And while defendant recognizes that there innumerable factors which influence a

5  Court's sentencing decisions it is also true that the law required the Court " . . . to avoid

6

7  unwarranted sentence disparities among defendants with similar records who have been found

8  guilty of similar conduct" [**18 U.S.C. §3553(a)(6)**]. Alberti, the only sentenced defendant and one

9  who was much more involved in the conspiracy as a recruiter of minors to become prostitutes and

10  a mere 4 years younger than defendant when she began, received 24 months - - a factor which the

11  Court needs to consider here.

12

13          Defendant would submit that this case is notably different from the majority of

14  cases with similar charges in that defendant's conduct before the offense clearly demonstrates that

15  his conduct here was aberrant and not in conformity with the way he has lived for the 20 years

16  before his involvement. It is clear that defendant is not going to re-offend and it is equally clear he

17  is not a danger to society. 48 months in jail is not going to change that. Defendant therefore

18

19  requests the Court to follow Probation's recommendation.

20                                    **VI**

21                              **CONCLUSION**

22      Based on the mitigating factors discussed <u>supra</u>, defendant therefore requests the Court to

23  follow Probation's  recommendation for a sentence of 48 months.

24

25                          RESPECTFULLY SUBMITTED,

26                          R.E. SCOTT & ASSOCIATES

27

28

Dated:  _____11/16/13_____          By:_____/s/_____
                                          R.E. SCOTT, Attorneys for
                                          Defendant CHRISTOPHER WELDON

# EXHIBIT "A"

July 23, 2013

Dear Honorable Judge Virginia Phillips,

My name is Christopher Weldon and I am writing to you to formally introduce myself.

Your Honor, I am extremely embarrassed for my son Chris, my fiance Alexis, my mother Marlene, my grandmother Adie and, most especially for myself. I am embarrassed for participating in something as bad as the charges against me. I am very sorry for being nonchalant and stupid. The two words that come to mind to when I think about my actions while being involved in this conspiracy is stupid and careless.

You Honor, I expected great things for me and my family and jail was not one of them. My fiance and I planned our son's first year together, and it hurts me deep inside to go each day without them both. Also, I think a lot about my mother and my grandmother. My stupidity in this conspiracy cost me the jobs that I had. It took me away from my grandmother and prevented me from taking care of her when she needs me. But most of all, your Honor, it cost me my freedom.

I can say that back in 2011 my actions were very immature. But, now in 2013, I am a totally different person. And after all of this is over, I intend to be the successful person that my fiance and son are counting on for a husband and dad.

Once again, your Honor, I am sorry, embarrassed, sincere, hurt and apologetic for the pain and stress I caused to others.

Thank you so much for taking your time to read my letter.


Sincerely yours,


Christopher Weldon

August 2, 2013

Honorable Judge Virginia Phillips,

I am writing to you on behalf of Christopher Markus Weldon, my son. My name is Marlene Weldon. Christopher has had a very hard life. Even so, I have always been proud of him. I am thankful to God for blessing Christopher to survive me, a mother who had alcohol, drug and mental problems off-and-on throughout his life. My life has been filled with bipolar disorder, anxiety and panic attacks. I tried to fix myself through drinking and using drugs. This made Christopher's early life difficult. He was back and forth from me to my mother and to my sister. Finally my sister had to take care of him for me while I sought treatment. I thank God for my sister and miss her greatly since she died three years ago from breast cancer.

Christopher never had a dad. His biological father, Henry Broussard, became ill shortly after Christopher was born and died before Christopher could get to know him. Christopher never knew his biological father and he always wished he had his father. Now that Christopher is a father himself, he wants to be the best father possible for his son, Christopher, Jr. I am so proud of how good a father Christopher has been for his son.

These legal problems have separated Christopher from his little family. I feel sad for them because they need him so much and he needs to be there with them. His son has asthma, like Christopher. Even though Christopher had asthma, he played football in school and he was good at it. I remember watching him play and I was so proud of how hard he worked to be on the team. He did this instead of the gangs and other activities all around in the neighbourhood. I was proud of the choices he made. I know he was always trying to do the right thing because he believes in God. That is one thing that I did right as a mother was teaching him about God.

Christopher has been through so much sadness in his life because of his mother and not having a father. Instead of me taking care of him, he started taking care of me at a very young age. Sometimes I was too ill to deal with life. I tried suicide a few times, but God did not let me die. I did not know why at the time. But later I realized that having him gave me a reason to live. He helped me to want to go on, but now my past years of abusing my body have caught up with me. I had a heart attack a couple years ago and the doctors told me that there is irreversible damage. I did not tell Christopher, but shortly after he was arrested, the doctor told me to get my affairs in order. I have not told Christopher because I do not want to add more stress onto him while he is incarcerated. I know that incarceration is overwhelming for him already. And I want to stay alive long enough to see him come home.

His grandmother also misses him. He had been her caretaker. She has dementia and feels abandoned because Christopher is not there. I tried taking care of her, but I am not strong enough. My sisters tried putting her into a home, but she could not get along with the other people there. So now she is bounced around from sister to sister not having a place of her own. She misses Christopher.

Thank you for your understanding and compassion.

Sincerely,

*Marlene Weldon*

Marlene Weldon

28 July 2013

Robert E. Perrine
2115 G. Street, Apt 2
Bakersfield, CA 93301
Telephone: 949-212-8487

Honorable Judge Virginia Phillips

RE: Christopher Weldon

      I first met Christopher Weldon in July 2008. I began dating his mother and she introduced us. Christopher made it a point to be there and to look after his grandmother on nights and during weekends. He made sure his grandmother was not left alone. He made sure she had food that she liked. He made sure she was comfortable and he made sure she did not wander away from home. I know that as a teenager there were many times that he wanted to go play football with his friends, or go watch a game with his cousins, but he took his responsibilities seriously.

      When Christopher's first car died he needed help getting another. He did the research and hunted until he found the car he wanted for a price he could afford. I helped with the down payment and Christopher worked to make his car payments, buy gasoline and make sure his insurance was always paid on time. At times he worked two jobs. For a while he was working so many hours that he had to give up his two favorite pastimes: playing football and watching the games. Even so, he made it a point to check on his grandmother every day.

      In 2009 and 2010 I saw Christopher for a few minutes here and there a couple times a month. He talked a little about his jobs, finishing his GRE and planning for college. He was disappointed that it took so long to finish his GRE, but he persevered. He took care of his grandmother. And whenever his mother lost her phone, buried it under the pillows or let the battery run down, I knew I could call Christopher to go and check on her. I called him my step-son and he called me dad.

      As an information technology consultant, I need to go where the work is. In August 2011 I went to Horsham, Pennsylvania for three months. In November 2011 I went to Sunnyvale, California for six months. Most recently I have been in Bakersfield, California. Before his arrest, I swapped text messages with Christopher and occasionally talked with him on the telephone. I have only seen him in person a few times since August 2011, but I was impressed by the sense of responsibility he has for his girlfriend and their baby. I know that he again tried working two jobs, but this time found that the commute was too costly. I know that he still made it a point to check on his grandmother, until she was able to get into retirement home. He has sent me pictures of his son, and conveyed his sense of responsibility for his family.

3

Since his arrest, we have communicated through letter. He does not write many words, but he has let me know how much he wants to be there for his son and for his family.

I trust Christopher. I respect Christopher. I believe he is an honorable person who is committed to being the best father he can be.

Sincerely yours,

Robert E. Perrine

4

May 31, 2013

To Honorable Judge Virginia A. Phillips,

I am Brittany Henderson, a former co-worker and friend of Chris. I have known him since, where both worked for Los Angeles Unified School District, I was a Special Ed Trainee and Chris was a Supervision Aide. We also worked together at the YMCA after school program where we both were teachers. I am currently a preschool teacher at Southbay CDC, working with children ages 3-5. Chris was like my little brother and best friend. Whenever I needed him for anything he was always there for me. There were a few times when I was discouraged and feeling down and out, Chris was there to give me words of encouragement that I still carry with me today. Chris was a family man, always speaking highly of his mother, grandmother and aunt who passed from breast cancer. Chris was so affected by his aunts death that he wanted to somewhat pay his respects whenever he could by participating in the breast cancer walk, wearing a pink ribbon or shirt or merely purchasing items that went to the breast cancer benefit. Chris was the "go to man" at work. He was a part of the Search and Rescue Crew in case of a fire or earthquake, he was responsible for fixing classroom computers when they crashed, monitoring students on the yard at recess and lunch as well as supervised them while playing on the yard. Chris is a warm hearted jokester, always being goofy, never involving himself in others business. Chris was the first one I would call or text for anything. Eventually Chris began working two jobs because he was going to be a new father. Once he found out the news, he was ecstatic. Chris would always come to me with parenting and pregnancy questions because I have a four year old daughter as well as my education in Early Childhood Education, so I had quite a bit of experience. Chris was also there for my family. He helped me, my grandparents and a few

cousins of mine move to different cities. Whenever I had car issues or something wrong with my phone Chris was the one I called. Chris has even become friends with many of my other friends because he has such a great personality. He makes people comfortable right away and always willing to help whenever possible. Chris was a good guy, friend and father and I miss him dearly.

Sincerely,

Brittany Henderson

May 31, 2013

To Honorable Judge Virginia A. Phillips,

I am Danielle Jones, I have been knowing Christopher since 11th grade where we both attended Compton High School. I am currently a Team Member with Home Depot. As long as I can remember, Chris was the funny guy in school. He had a lot of friends both male and female. Chris was always the guy I went to with my relationship issues, he really was like a counselor to me. Whenever I presented him with something that wasn't going right in my life, Chris was always there to tell me when I was right and when I was wrong. Many people in my life have never done that for me because they think they are helping me by telling me what I want to hear. By Chris being open and honest with me and being a true friend, it has helped me in so many ways and I have grown into a mature adult. Just the advice he gave me in High School and before his incarceration has truly stuck with me. Upon finding out that Chris was going to be a father, I was instantly happy for he and his girlfriend. She and their son are very lucky to have Chris in their life, he is a wonderful man that I know they are truly missing him.

Sincerely,

Danielle Jones

7

June 14, 2013

To Honorable Judge Virginia A. Phillips,

I am Ashley Martin, I am an previous co- worker of Christopher. We worked together at Target for a couple of months, both apart of the over night crew. I have known Christopher for 2 years. I am currently still a team member working for Targets overnight crew. Initially meeting Chris and talking to him for the first time, I felt like I've known him for years. Working side by side with him made the time go by fast because he was such a jokester. Chris would always talk about his grandmother and aunt that passed away from Cancer and that really helped me get through rough times in my life because my father passed away from Liver cancer back in 2010. I knew Chris had another job working for LAUSD with Children and soon enough, having two jobs took a toll on him and he eventually resigned from Target. After that, we lost touch and I found out Chris was a new father and shortly incarcerated. Once I heard that I was instantly shocked and was willing to do anything to help. Chris was a good guy and I hope my letter touches someone to see the real Chris that I knew.

Sincerely,

Ashley Martin

8

May 31, 2013

To Honorable Judge Virginia A. Phillips,

I am Kayla Cole, a friend a of Chris. I am a security guard for Securitas. I have known Chris for about 3 years. Chris has an older cousin (Thomas) that dates my older sister (Gabrielle). Chris and Thomas were very close so on the weekends we would all go to Thomas' house in Colton and just laugh, party and play games. I mainly remember Chris for being goofy and telling jokes. Chris was always more observant and laid back and always minded his own business. When Gabrielle would try to get his opinion about whyThomas would do certain things, Chris would always say "I'm not in it, I love all of you and don't want to take any sides so I just won't say anything". I knew Chris worked with children and said he loved his job but when he found out he was having a child, he then moved to Colton to look for a second job. Chris moved to Colton because the rent was cheaper, Thomas and the rest of his family were living close by as well as to be closer to the mother of his child so he can help her with anything. I miss laughing and talking to Chris very much and wishes him well in the future.

Sincerely,

Kayla Cole

Kayla Cole

9

To Honorable Judge Virginia Phillips

      I am writing this letter on the behalf of my cousin Christopher M. Weldon whom I have known my entire life and now through unfortunate events his character has become into question. Allowing him to be absurdly accused of unlawful acts, my cousin Christopher M. Weldon is a kind, loving, life filled human being that always have made others laugh and have always been compassionate to other in a unexplainable way. It's as if he feels the pain others are going through himself, honorable judge. As a teenager my cousin worked his way through school while taking care of his mother and grandmother  a challenging task but overcame with a smile and laughter. As an adult he worked hard at an elementary school to keep a flow of money and eventually buy his first car, later to meet a beautiful woman and have a beautiful son only to be snatched away from both of  them a couple of months into his child's life. So honorable judge I am hoping and praying when sentencing my cousin Christopher  M. Weldon that you would take into consideration the fact that he is in no way a bad person and would show compassion on him as he have shown others his entire life.

                          Sincerely:

                          Thomas T. James

June 09, 2013

1440 East 51st Street

Los Angeles, California 90011

To Honorable Judge Virginia A. Phillips,

My name is Beatriz Amezcua, currently an office administrator for Seaport Tire Company. I am a friend and ex co-worker to Christopher Weldon. I was a behavior therapist when I met Chris three years ago. He was part of the yard supervision.

Throughout the three years that I interacted with Chris we became good friends, to the point that I along with my fellow co-workers made him a baby shower for his baby. Although, Chris couldn't make it because the baby decided to get here a little earlier than expected, he was very grateful for the shower. Chris was always very happy and helpful in any way possible. Since, I worked with special needs children Chris was always there to help us watch our little ones. As a friend Chris was always there for me and made sure to always ask "how are you this morning?" always brought a smile to my face.

Chris was always talking about his pride and joy, his baby boy. He was extremely excited to be a dad. He also was very caring toward his grandma; she was his everything and always made sure she was okay.

Chris to this day is an excellent friend, ex co-worker, father, and grandson.

Thank you for taking the time to read my letter.


Sincerely,

Beat Amezcua

Beatriz Amezcua

11






ROD HOOPS, SHERIFF-CORONER

May 22, 2013

To Whom It May Concern:

Inmate Weldon, Christopher booking # 1208300416 is an inmate worker at the Central Detention Center.  Inmate Weldon has worked since December 21,2012 with no disciplines to date.

Inmate workers may do the following tasks:

1.  Assist in serving/preparation of inmate meals
2.  Distribute/wash inmate clothing
3.  Maintain facility cleanliness

If you need any further assistance in reference to the above-mentioned inmate, please contact me at (909) 386-0958.

Sincerely,

L. Koahou, SCS
H. Guerra, Captain
Central Detention Center



January 8, 2013

TO WHOM IT MAY CONCERN:

This is to certify that Marlene Weldon is a patient under our care for multiple medical issues.  She requires family assistance. We are asking for early release of her son Christopher Weldon to facilitate her care as he has been her primary caregiver.

Please feel free to contact my office if you have any questions or concerns.  Thank you for your assistance in this matter.

Sincerely yours,

Angela J. Lamotte, MD
Compton Internal Medicine
818 W Alondra Blvd
Compton CA 90220-3500
310-537-1337

13

**PROOF OF SERVICE**

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

       I am employed in the County of Riverside, State of California.  I am over the age of 18 years and not a party to the within action; my business address is 125 Business Center Drive #C, Corona, CA 91720.

       On 11/17/13, I served [ ] the original [X] a true copy of the following document(s) described as **DEFENDANT'S SENTENCING MEMORANDUM** on the interested parties in this action as follows:

       PAMELA CHEN, U.S. Probation Officer, 312 No. Spring St. #600,
       Los Angeles, CA 90012

☐    BY MAIL - I caused such envelope(s) with postage thereon fully prepaid, to be deposited in the U.S. Mail at Corona, California, to the below mentioned addressee(s).

☒    BY MAIL - I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice, this document will be deposited with the U.S. Postal Service on this date with postage thereon fully pre-paid at Corona, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐    BY FEDERAL EXPRESS - I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice, this document will be deposited with Federal Express overnight delivery service and delivered to the following addressee(s) by 12:00 noon on the following day.

☐    BY TELECOPIER - I caused such document(s) to be transmitted to the telephone numbers indicated above on _____.

☐    (STATE) **I DECLARE UNDER PENALTY OF PERJURY** under the laws of the State of California that the foregoing is true and correct.

☒    (FEDERAL) **I DECLARE UNDER PENALTY OF PERJURY** under the laws of the United States of America that the I am employed in the office of a member of the bar of this Court at whose direction the service was made.

       EXECUTED on 11/17/13, at Corona, California.

                _____
                     /s/
                R.E. SCOTT